BARFIELD, Judge.
Florida Power Corporation (FPC) appeals an order of the Department of Environmental Regulation (DER) denying its application for a wetland resource permit, contending that DER improperly rejected the hearing officer’s determination that FPC’s project would have no adverse impacts and was not contrary to the public interest. This controversy focuses on the distinction between forested wetlands and herbaceous wetlands. Here, forested wetlands were destroyed by clear cutting of the trees, leaving an herbaceous wetland. While this action expanded the habitat of plants and animals dependent on herbaceous wetlands, it also denied habitat to plants and animals dependent solely on forested wetlands. DER determined that the public interest in the extent of the impact on the environment from this destruction of the forest was a policy matter for its determination and not a question of fact to be resolved by the hearing officer. We agree and affirm the agency’s final order.
FACTS
FPC owns an easement over property in Reedy Creek Swamp, a large mixed wetland forest system in Osceola County, on which it seeks to install an electrical transmission line between Intercession City and Poinciana (the ICP line), which is expected to last at least thirty years. The ICP line uses a corridor sixty feet wide and fourteen miles long,[1] passing through three areas of forested wetlands under DER jurisdiction. The affected areas he within the South Reedy Creek Basin, which contains over 92,000 acres of upland and wetland habitats, including 31,448 acres of contiguous forested wetland.
In December 1989, FPC filed an application with DER for a wetland resource permit to place 353.1 cubic yards of fill to support the transmission poles. The application stated that the fill would impact .0135 acres of jurisdictional wetlands.[2] Prior to obtaining the permit, FPC undertook clearing activities during March-June 1990, cutting all vegetation within the sixty-foot transmission line corridor to the ground or water line. DER conducted a surveillance flight over the project site in June 1990 and visited the site in June and in August. The flight revealed the nearly completed clearing of the forested *547 wetland, and the field appraisals indicated that some dredge and fill had occurred as a result of the land clearing activities.[3] At an on-site meeting in late August 1990, the parties discussed mitigation. FPC eventually offered to preserve one acre of forested wetland, at a site east of the Intercession City substation near State Road 17/92, for each acre of forested wetland impacted.
In September 1990, DER issued a notice of intent to deny the permit request, finding that the proposed installation activities would actually impact approximately 6.01 acres, 5.997 acres of which were “secondary impacts” of the proposed construction (i.e., the clearing activities). It found that the wetland adjacent to State Road 17/92 “will be impacted by minor trimming of branches within the mature forested canopy and by removal of small subcanopy trees beneath the existing corridor,” that the main crossing of the swamp “involves secondary impacts to a mature mixed forested wetland” (noting endangered and threatened orchids adjacent to the cleared corridor), and that the wetland south of the main crossing is a cypress community with saw grass as the primary understory. It found that the proposed alignment “has and will continue to result in disturbances to hydric soils and vegetation as a result of the tree cutting, installation and maintenance activities,” that the power line “will result in a permanent change in the character of the wetland from a mature mixed forested canopy to a herbaceous wetland,” and that this permanent change “is expected to diminish the overall productivity of the system and adversely affect wildlife utilization.”
DER noted that FPC had not provided it with an alternative analysis for the power line on the initial application and found that it was therefore “not clear if another alternative would have further reduced the impacts of the project.” It observed that one proposal which could have been submitted “uses the existing right-of-way adjacent to roadways which cross Reedy Creek (such as Pleasant Hill Road).” It found that FPC had not clearly explained how turbidity would be controlled during the installation of the poles, that degradation of water quality was expected, and that FPC “has not provided reasonable assurance that the immediate and long-term impacts of the project will not result in the violation of water quality standards” or that the project is not contrary to the public interest, citing Florida Administrative Code Rules 17-312.070 and 17-312.340, and sections 403.918(2) and 403.919, Florida Statutes. It required FPC to address turbidity controls and “how the original, natural elevations will be returned to pre-construction condition,” and to submit a mitigation proposal “which adequately offsets the secondary impacts of the project,” noting that “the Secretary’s policy memo concerning preservation-as-mitigation states that the minimum ratio accepted by the Department will be 10:1 (preservationdoss)” and that “[t]he current proposal of 1:1 ratio falls short of this policy.”
The title to chapter 84-79, Laws of Florida, which created the “Warren S. Henderson Wetlands Protection Act of 1984,” Part VIII of chapter 403, Florida Statutes, now entitled “Permitting of Activities in Wetlands,” reads as follows:
WHEREAS, Florida’s wetlands are a major component of the essential characteristics that make this state an attractive place to live. They perform economic and recreational functions that would be costly to replace should their vital character be lost, and
WHEREAS, the economic, urban, and agricultural development of this state has necessitated the alteration, drainage, and development of wetlands. While state policy permitting the uncontrolled development of wetlands may have been appropriate in the past, the continued elimination or disturbance of wetlands in an uncontrolled manner will cause extensive damage to the economic and recreational values which Florida’s remaining wetlands provide, and
*548 WHEREAS, it is the policy of this state to establish reasonable regulatory programs which provide for the preservation and protection of Florida’s remaining wetlands to the greatest extent practicable, consistent with private property rights and the balancing of other vital state interests, and WHEREAS, it is the policy of this state to consider the extent to which particular disturbances of wetlands are related to uses or projects which must be located within or in close proximity to the wetland and aquatic environment in order to perform their basic functions, and the extent to which particular disturbances of wetland benefit essential economic development,
[[Image here]]
Section 403.918, Florida Statutes (1989), which establishes the criteria for granting or denying permits under the Act, provides in part (emphasis supplied):
(2) A permit may not be issued under ss. 403.91-403.929 unless the applicant provides the department with reasonable assurance that the project is not contrary to the public interest. However, for a project which significantly degrades or is within an Outstanding Florida Water, as provided by department rule, the applicant must provide reasonable assurance that the project will be clearly in the public interest.
(a) In determining whether a project is not contrary to the public interest, or is clearly in the public interest, the department shall consider and balance the following criteria:
1. Whether the project will adversely affect the public health, safety, or welfare or the property of others;
2. Whether the project will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats;
3. Whether the project will adversely affect navigation or the flow of water or cause harmful erosion or shoaling;
4. Whether the project will adversely affect the fishing or recreational values or marine productivity in the vicinity of the project;
5. Whether the project will be of a temporary or permanent nature;
6. Whether the project will adversely affect or will enhance significant historical and archaeological resources under the provisions of s. 267.061; and
7. The current condition and relative value of functions being performed by areas affected by the proposed activity.
(b) If the applicant is unable to otherwise meet the criteria set forth in this subsection, the department, in deciding to grant or deny a permit, shall consider measures proposed by or acceptable to the applicant to mitigate adverse effects which may be caused by the project....
Section 403.919, Florida Statutes (1989), entitled “Equitable distribution,” codifies the “cumulative impact doctrine”:
The department, in deciding whether to grant or deny a permit for an activity which will affect waters, shall consider:
(1) The impact of the project for which the permit is sought.
(2) The impact of projects which are existing or under construction or for which permits or jurisdictional determinations have been sought.
(3) The impact of projects which are under review, approved, or vested pursuant to s. 380.06, or other projects which may reasonably be expected to be located within the jurisdictional extent of waters, based upon land use restrictions and regulations.
Rule 17-312.300 et seq. establish the criteria for evaluating mitigation proposals. DER must first explore “project modifications that would reduce or eliminate the adverse environmental impacts of the project” and suggest any such modifications, either in addition to or in lieu of mitigation. It may not require mitigation, but it must consider “any mitigation proposed by a permit applicant in accordance with this rule.” Rule 17-312.-300(7) provides:
The amount, type and location of mitigation, if any, required of electric utilities conducting dredge and fill activities for the purpose of providing energy service shall be determined in conjunction with the criteria in Section 403.918, F.S., in recogni *549 tion of the fact that such activities generally promote the public interest.
Rule 17-312.340 sets the standards for evaluating mitigation proposals, noting that they must be considered “on a case by case basis” and that offsetting adverse impacts “will usually be best addressed through protection, enhancement or creation of the same type of waters as those being affected by the proposed project.”
In March 1991, FPC filed a request for formal administrative hearing. In June 1991, it filed a complaint in the circuit court for a declaratory judgment and injunctive relief, together with a petition for a writ of mandamus, alleging that it would allow all trimmed vegetation to resume normal uninterrupted growth after the transmission line was in service except for limiting vegetation height to fourteen feet directly below the lines, asserting that this maintenance activity would be necessary to provide adequate clearance between vegetation and the transmission line to prevent possible fires and ensure safe working conditions for its maintenance staff. It contended that virtually no adverse environmental consequences would result from the work other than temporary displacement during actual pole installation and the need to trim and maintain surface vegetation in the vicinity of the poles and transmission line. It argued that of the 6.01 acres of alleged total impacts, approximately 5.997 acres were alleged to be “secondary impacts” of the clearing already undertaken, and that DER was attempting to expand its permitting jurisdiction beyond its statutory mandate because FPC’s clearing activity was not subject to DER’s permitting jurisdiction.
DER filed a motion to dismiss the complaint, noting that no final agency action had been taken with regard to the formal hearing FPC had requested and arguing that FPC had failed to exhaust its administrative remedies. After a hearing, the circuit court denied the petition for writ of mandamus and dismissed the complaint with prejudice, based on FPC’s failure to properly exhaust its administrative remedies.
This court affirmed the circuit court’s action in Florida Power Corp., Inc. v. State, Dept. of Environmental Regulation, 605 So.2d 149 (Fla. 1st DCA 1992), noting that we have previously recognized that DER may consider the “secondary impacts” which will result from a project if a permit necessary for its implementation is granted. We found that it could not be said that DER’s claim of jurisdiction was “without colorable statutory authority,” or that it had acted “clearly in excess of its delegated powers,” so as to justify an exception to the judicially created doctrine of exhaustion of administrative remedies. We held that DER may consider the impact of the continuous maintenance activity that will take place in order to restrict surface vegetation in the fourteen-mile transmission line corridor, because this anticipated maintenance activity is causally related to the proposed dredging and filling necessary for installation of the transmission poles and because evidence of the effects of the maintenance activity is relevant in determining whether FPC has provided reasonable assurance that the project is not contrary to the public interest.
The application, as modified in November 1991 to exclude the corridor adjacent to State Road 17/92, reduced the amount of fill to 301.106 cubic yards, the length of the corridor to 10 miles, and the length over jurisdictional wetlands to 4,810 linear feet. FPC asserted that the modified project impacts .0084 acres of wetlands, while DER asserted that the total impact of the modified project continues to be 6.01 acres, of which approximately six acres are affected by “secondary impacts.”
The parties stipulated that the proposed project “benefits the public welfare by producing and providing for the reliable transmission of electricity to residents of the State” and that it will not adversely affect navigation or significant historical and archaeological resources. The five-day hearing centered on the relative condition of the area impacted and the impact of the clearing on the conservation of vegetation, fish and wildlife. FPC admitted that the canopy has been removed in a sixty-foot swath through the swamp and that maintenance activities will result in a change in the corridor from forested wetlands to herbaeeous/shrubby wetlands, but it asserted that there has been “no *550 adversity” resulting from the change in the character of the wetlands. DER argued that this was in effect “after-the-fact permitting,” that six acres of forested wetland has been removed and will not be replaced, and that what is left is a disturbed herbaceous marsh that will, along with past, present, and future projects, have a cumulative negative effect on Reedy Creek Swamp as a whole.
Eugene Rasponi, FPC’s employee, was presented as an expert in electrical transmission line planning and design. He testified that FPC had evaluated an alternate route which would have followed an existing roadway, but that this route would have been 2.5 miles longer and would have cost $700,000 more. He stated that the project was designed to minimize environmental impact by using wooden poles and shorter spans, requiring less corridor width and not requiring access roads, and by using low pressure high flotation equipment for the construction. He testified that corridor maintenance would be undertaken on a three-to-five-year cycle, that an area fifty feet square around each pole would be kept clear to the ground, and that vegetation would be cut to the ground or water level for seventeen feet on either side of the center line of the sixty-foot wide corridor. He stated that the remaining outer thirteen feet on each side would be allowed to regenerate, except for fast-growing trees expected to reach thirty feet or more in height, which would be girdled or treated with EPA approved herbicides by specific and selective application, and that all exotic or nuisance target species would be removed from the entire right-of-way.
FPC’s Robert Klemans testified that FPC was shocked when DER raised the issue of mitigation for clearing, that FPC met with DER to discuss preservation mitigation ratios of 10:1 and 50:1 based on DER memos, and that FPC finally offered a six-acre preservation mitigation site. He stated that most of the easements were obtained without cost, that videos and aerial photographs indicated that “things have grown back very significantly,” and that there is logging activity immediately adjacent to the ICP corridor.
FPC’s Jeffrey Pardue testified that he researched dredge and fill permitting associated with twenty-three transmission lines involving wetlands since 1984, and that it was his understanding that no other electrical utility has been required to mitigate for clearing. He stated that the clearing of the ICP corridor was undertaken in the dry season to minimize adverse impacts, and that a silt screen was installed to prevent erosion dining the installation of the poles. He testified that the selected route crossed Reedy Creek at the narrowest point in the swamp, but that he did not have notable environmental concerns with either route, and that FPC did not anticipate a need for mitigation once it determined that access roads would not be necessary.
FPC’s Charles Duncan testified that he had overseen the clearing activity and that there was no digging and no earth moved, that it was not wet at all, and that the silt screen was installed to prevent erosion once the rains began. He stated that when he returned in October, the site was covered in water and growth, that there were logging activities within 200-300 feet of the corridor, and that FPC’s fence had been taken down.
Dr. James Nicholas, a professor of urban and regional planning at the University of Florida, testified as an expert in land use and energy public policy regarding the direct benefit of the proposed ICP line to consumers, to FPC employees and stockholders, and to the general public. He valued freshwater wetlands at $l,000-$2,500 per acre and estimated that mitigation at a preservation ration of 50:1 would cost $300,000-$750,000.
Dr. William Dennis of Breedlove, Dennis and Associates, was presented as an expert in botany, wetland ecology, and wetland permitting. He testified that there are no trees in the corridor, but that some trees are coppicing (sprouting from stumps), that the herbaceous and shrub plants are essentially the same, and that if there were no maintenance, the corridor would return to forest in 30-50 years. He stated that with maintenance, the shrub species will over time become more dominant, and that wetland functions (storage capacity, recharge potential, water quality, biomass, productivity, habitat) are not diminished, noting that some have probably increased.
*551 Dr. Dennis stated that, as a general rule, herbaceous wetlands are more productive (productivity measured by the amount of plant material accumulated per unit area over time) than forested wetlands. He testified that, while the habitat was definitely changed, he was not aware of any study showing any species adversely affected, and that quite a number of species (for example, wading birds) would be benefitted. He stated that while there are certain interior woodland species that cannot live in open cleared area, these species still have enough habitat available in the Reedy Creek flood plain. He could not say categorically that one type of wetland is better than another, but he felt that the cleared area has not affected the value of the forested area, and he “just cannot believe that there is any impact to this overall system that would result from that small amount of wetland clearing.” He stated that sixty feet is no wider than some of the channels in Reedy Creek, and that in this case, the impacts are de minimis and no adverse impacts have been demonstrated. He testified that the mitigation site is very similar to the ICP site and should adequately offset any impacts associated with the clearing.
On cross-examination, Dr. Dennis testified that the opening of the corridor provides sunlight and the opportunity for numerous species to grow, including “nuisance” and exotic species (cattails, primrose willow, dog fennel, water hyacinth, Micania vine), and admitted that it was more difficult to replace freshwater forested wetland.
Steve Godley, with Biological Research Associates, testified as an expert in endangered and threatened species, wildlife ecology, and wetland resource permitting. He presented the results of an analysis of the impacted area, including evaluation of “edge effect” using on-site sampling and data collection to compare the biota in the corridor, on the edge, and in the forest. He also presented the results of a literature search of scientific studies on electrical transmission line construction impacts, particularly in forested wetland areas, and a comparative assessment of eight other transmission lines.
Godley found that the mean “cover” was 85% in the corridor, higher than in the forest, and testified that a study showed that the net primary productivity of herbaceous wetlands is three times higher than in the adjacent flood plain forest, and that the decomposition rate is two or three times higher in the marsh. Using three “similarity indexes” and averaging all the comparisons, he found that in terms of species composition, the corridor and forest sampling sites were essentially identical, with a two or three-fold difference in the number of light-loving and light-intolerant plants. He cited studies on the effects of clearing utility corridors in forested wetlands which showed no long term effects on the shrubs. He testified that the similarity indexes for canopy were not applicable, since there are no longer any trees in the corridor.
Godley’s amphibian, fish, and vertebrate sampling revealed a general pattern of the most number of species in the edge, closely matched by the corridor, with sightly fewer numbers of species in the “near” and “far” forest. He testified that every group in which there were significant differences was more abundant in the corridor or the edge, relative to the forest sites. He sampled birds for four days in July, the end of nesting season, and found 164 individuals (21 species) in the forest and 143 individuals (18 species) in the corridor. He found fifteen species in both locations, and nine species which were exclusive to one or the other location. He testified that, using the similarity indexes, he was not able to detect a significant difference in the number of species. He stated that mammals were sampled in October 1990 because of the very high water conditions, and that all quantitative information indicated no adverse effect on wildlife utilization.
Godley also did a summary of the potential effects of the clearing, using the quantitative data, literature surveys, and a qualitative evaluation of other corridors. He found that approximately 197 species of vertebrates (97 bird, 32 fish, 26 mammal, 25 reptile, 17 amphibian) are likely to use the swamp in an average year, and that they can be divided into two groups, wetlands-dependent (species which must spend some component of the life *552 cycle in the swamp) and ubiquitous. Of the 97 bird species, he found that 64 species are likely to breed in the swamp, and that 58% are permanent residents. He found 25 fish species positively affected, six fish species not affected, and two fish species (shiners) negatively affected. He found all the wetland-dependent amphibians positively affected, and none of the amphibians negatively affected. He found all the wetland-dependent reptiles positively affected, and three of the ubiquitous reptiles (two kinds of skink and the rat snake) negatively affected. He found most of the ubiquitous mammals positively affected, but three mammals (grey squirrel, flying squirrel, and wood rat) negatively affected. He found the “vast majority” of the wetland-dependent birds positively affected (because they eat reptiles and amphibians), but that twenty-one bird species would be negatively affected, including the wood duck, six woodpecker species, two vireo species, seven warbler species, four thrush species, and the northern panula. He testified that many of the negatively affected birds nest in cavities in trees, but that a study showed that all cavity shortages were in upland forests.
As to endangered or threatened species, Godley found that the only endangered reptile, the indigo snake, would be positively affected, that none of the fish or mammals were listed as endangered or threatened, and that of the endangered or threatened birds, three were positively affected (wood stork, little blue heron, snowy egret) because they eat fish, and that the bald eagle, which prefers lakes, would be positively affected. Of the listed plants, he testified that ferns and epiphytes (orchids, bromelids) would be negatively affected. He noted a trend toward fewer listed plant species adjacent to the corridor, which he attributed to weedy conditions and high light and wind exposure. He discussed the various lists and opined that no truly endangered or threatened plants were affected by the clearing, and that if they were, they were lawfully taken with the landowner’s permission.
Godley stated that the ICP corridor had caused a change in the system, but that the wildlife utilization in the whole system is balanced across all kinds of animals and does not appear to have been negatively affected. He testified that the majority of the animal species are likely to be positively affected, and that the species which were negatively affected are “almost at the point of a de minimis effect.” He testified that the corridor had not adversely affected recreation and had improved hunting. He did not believe there was a solid scientific basis to indicate that the corridor had fragmented wildlife in the swamp. He discussed nest parasitism (some bird species lay their eggs in other birds’ nests), and testified that the brown-headed cowbird likes open spaces and parasi-tizes warblers and vireos at the edge of the forest, within twenty-five meters, but he did not think the brownheaded cowbird, which is a problem in northeastern upland forests, would view the corridor as an upland habitat.
Godley stated that he did not think the corridor would adversely affect wetland functions, and that he felt FPC had put forth reasonable assurance that the project was not contrary to the public interest. He discussed cumulative impact analysis and concluded that there might be another mile of crossing in the next thirty years and that the weight of the evidence would suggest that the ICP line “is going to have a negligible or de minimis effect on productivity and the wildlife utilization of the Reedy Creek Swamp system.” Godley examined all the other transmission lines in central Florida with potential wetland crossings and concluded that the Reedy Creek system is not unique, but admitted that no other transmission line had the same maintenance plan as the ICP project.
John Vogel, of Natural Resources Planning Services, testified as an expert in forestry and the impacts of clear cutting. Noting silviculture is exempt from DER regulations, he found that since 1984, the regeneration from cypress logging near the corridor has been “rather dramatic” and opined that the corridor, if left alone, would do the same thing. He estimated that $700-$800 worth of timber had been removed from the corridor and testified that he found the clearing “very clean” with little disturbance, and that he *553 didn’t think the wetlands function had been interrupted.
Dr. Miles Smart, with Breedlove, Dennis and Associates, was presented as an expert in water chemistry and limnology. He testified that the water quality in Reedy Creek eighteen months after the clearing was within the ranges observed over the ten-year period for which historical data was available. He stated that he found no impediment to flow, and that he felt the project was not likely to cause erosion or shoaling.
Anthony Arcuri, with Environmental Consulting & Technology, testified as an expert in wetlands ecology and electric transmission line impacts. He compiled a bibliography of sixty-seven references on ecological impacts of transmission lines in forested wetlands. He also visited the corridor in October 1991, finding that it had revegetated except for the trees and that there appeared to be minimal disturbance to the area. He opined that in general, shifting of forested wetland to herbaceous wetland does not reduce function ascribed to wetland areas, and that some functions are unchanged, while primary productivity increases in the corridor. He found no large-scale invasion of nuisance or exotic species. He stated that “edge effect” increases wildlife utilization, species numbers and diversity, and density of wildlife populations. He acknowledged that the project would cause a permanent shift in the wetland structure, but he stated that he did not feel it would cause a long term impact to the overall function or integrity of the wildlife system. He testified that he felt that the sixty-foot clearing “does not adversely affect Reedy Creek Swamp so as to warrant compensatory mitigation.”
Kevin Erwin testified as an expert in wetland ecology and wetland mitigation. He calculated that the impacted area was 0.02% of the total forested flood plain, and found Godley’s study “very thorough work” showing no negative effect on wildlife, water quality or other functions. He stated that he found no scientific validity to the 10:1 preservation ratio requirement in the 1988 mitigation memo, and that he felt mitigation should be based on functional evaluation. He testified that he could not think of any linear clearing projects that would be similar for purposes of cumulative impact analysis, and opined that these six acres “were not the straw that will break the camel’s back,” noting that this is a “very large, very diverse system.”
Barry Lenz, with Dames & Moore, was presented as an expert in biology and wetland permitting. He testified that he was involved with the 1988 permitting of the Tampa Palms corridor through Cypress Creek Swamp, which is like Reedy Creek Swamp, and that no mitigation was required for that project. He admitted on cross-examination, however, that the Tampa Palms line was run in an existing corridor.
Steve Fox, with Dames & Moore, and Dale Twachtmann, with Law Environmental, were also presented as experts in wetland permitting. Fox testified that he had been a DER division director and that he did not recall ever requiring mitigation for clearing of a utility line. He stated that he had worked on getting permits for the Maglev train project and for the South Georgia Natural Gas pipeline, in both of which mitigation was required, but that he considered these projects factually distinguished from the ICP line. He stated that the 1988 Twachtmann memo “legitimized preservation mitigation,” but that he found no scientific basis for the 10:1 preservation ratio. Twachtmann testified that he had been DER’s Secretary from 1987 to 1991, that he had prepared the DER mitigation rule, but that he had not intended the 1988 memo to be used for clearing by electrical utilities, since clearing does not involve dredge and fill. Twachtman stated that he did not think the Maglev and South Georgia Natural Gas projects were similar to the ICP line.
DER’s Donald Medellin was presented as an expert in dredge and fill permitting. He testified that he was the primary permit processor for the ICP application, that he visited the project site six times, and that he found threatened species in the forest adjacent to the corridor (yellow star anise, several orchid species, shoestring fern, Tillandsia). He'stated that the mitigation site is similar vegetatively to the ICP corridor, but there is much more human activity near the mitiga *554 tion site. He recommended denial of the permit because of the loss of habitat, the change in the nature of the system, the effect on threatened and endangered species, and the possible water quality and erosion problems.
Medellin testified that he had assessed two roadway projects affecting Reedy Creek Swamp for cumulative impact analysis, and that Barbara Bass had searched the files for the last five years and had found that proposed power lines typically followed roadways or existing power lines, so as to minimize wetland impacts. On cross-examination, he explained that “nuisance” plants outperform other species, that he found the similarity in the Reedy Creek Swamp road projects in the fact that they broke the canopy, that he found the orchid species adversely affected, and that there were similar impacts in the Maglev and South Georgia Natural Gas projects.
Dr. Francis Putz, associate professor of biology and forestry at the University of Florida, was presented as an expert in forest ecology. He testified that when he visited the site in November 1991, he found very few coppiced trees, and that the nuisance species were dominant. He noted that the corridor would be repeatedly disturbed by the maintenance activities, and stated that it would have a negative impact on the adjacent forest, “changing the balance.” He explained the “edge effect” (the influence of one ecosystem on an adjacent ecosystem) of the corridor on the forest, noting the changes in temperature, humidity, wind speed and patterns of growth of the trees, the density of weeds, the heightened probability of tree mortality, and that bird nest predation effects would extend 500 meters into the forest.
Dr. Putz observed that similarity indexes can be misleading and testified that Godley’s similarity indexes “did not reflect what he saw out there.” He found Godley’s animal tables satisfactory, but testified that “predatory birds and predatory mammals are favored” and will forage widely (part of the edge effect), and that squirrels and wood rats will suffer from the corridor clearing. He noted a fragmentation effect that interferes with the normal functioning of populations (for example, while there is no absolute barrier, flying squirrels “don’t go to ground and don’t swim well” and red-eyed víreos are unlikely to cross the corridor). He stated that it was important to distinguish between biomass and productivity, noting that an herbaceous community has a high productivity, but does not accumulate biomass. He testified that high productivity, though a goal in agriculture, is not an advantage in nature, explaining that a system in equilibrium has zero productivity because what is produced is exactly balanced by what dies, but “we have tipped the balance in this case.”
Dr. Putz testified that forested wetlands in Florida are being lost faster than any other community type (15% between 1979 and 1987 according to one study of Florida and South Carolina wetlands). He stated that Arcuri’s bibliography was good on power line rights-of-way, but lacking on effects of clear cutting, and that it contained “virtually nothing on forest canopy opening.” He testified that he thought the literature and Godley’s quantitative analysis were “directed attempts,” but he acknowledged a study by Randy Kautz with the Florida Game and Freshwater Fish Commission which found that there was no loss of lowland forest.
Bradley Hartman, with the Florida Game and Freshwater Fish Commission, testified as an expert in wildlife management. He and Stephen Lau, also with the Commission, wrote a report for DER in which they found that the wildlife population would be affected by the change in habitat (i.e., replacement of wooded wetlands by open marsh). He stated that there would be an increase in the number of individuáis and the number of species because of two habitats located next to each other, but that population of forest animals would be lost because of losses of hardwood mast (seeds and nuts), high canopy, cavities and snags. He testified that they were more interested in regional diversity than in local diversity, and that the corridor could actually reduce the number of species in the regional area. He stated that while there was some additional feeding for the little blue heron and the snowy egret (special concern species), these species do not need more feeding area. He explained the LAND SAT habitat *555 planning project which places emphasis on saving large tracts, more valuable because they buffer themselves. In his opinion, we are losing forested wetlands, resulting in a decline in forested species, some of which are the most rare.
On cross-examination, Hartman opined that the corridor did not pose an absolute barrier to any species of which he was aware. He stated that it was unlikely any bird species would be extirpated, but that several species would be adversely affected and “you don’t wait for extirpation.” He testified that while feeding availability is a limiting factor for wood storks in south Florida, this was not so in central and north Florida, and that while some animals would benefit from the corridor, “they are not the ones we are worried about.” He testified that there are numerous projects in addition to power lines that have the same cumulative impact. He stated that he considered Randy Kautz a credible wildlife biologist.
Stephen Lau was presented as an expert in wildlife ecology. He testified that he visited the site in June 1991 and that he has looked at several projects in Reedy Creek Swamp, an extremely valuable wildlife habitat. He stated that he found a very high water level in the corridor, and nuisance species which “take over and lower plant diversity.” He testified that the clearing will increase the habitat for “backyard” birds and wading birds, but will decrease the habitat for forested birds that need cavities in trees for nesting. He explained “edge effect” and stated that he thought the Biological Research study did not go far enough into the forest to sample. He testified that in his opinion, there has been a “dramatic loss” of forested wetlands in the thirteen years he has worked with the Commission.
Dr. Herbert Kale, with Florida Audubon Society, was presented as an expert in ornithology. He testified that he has been to Reedy Creek Swamp many times and that he visited the ICP site in November 1991. He stated that the permanent loss of forested wetland affects woodpeckers and interior forest birds (red-eyed vireo, prothonotory warbler, hermit thrush, ovenbird, northern water thrush), that the corridor brings in wading birds, and that there is an “edge effect” 100-200 meters into the forest. He testified that the corridor is large enough to attract brownheaded cowbirds, who are nest parasites, and that the shiny cowbird is also moving in from the Caribbean. On cross-examination, he stated that the sixty-foot swath is not fatal to any of the forest birds, but “every time you make a cut you’re creating problems and reducing habitat.”
DER’s Barbara Bass, Medellin’s supervisor, testified by telephone as an expert in wetlands permitting. She stated that she visited the site in November 1991, and that she is generally familiar with Reedy Creek Swamp, which she considers a good quality wetland habitat, especially the part south and east of State Road 17/92 which has been relatively undisturbed by human encroachment. She testified that the primary concern was the effect of the ICP corridor on the wildlife habitat from a cumulative impact standpoint, and that this was not as big a concern in the northern part of the corridor because there was an existing right-of-way and the swamp was not as pristine a system there. She stated that DER did not take enforcement action when it discovered the clearing of the corridor because of manpower restraints, noting that the application was pending at the time. She stated that in her opinion, we are “slowly but surely losing our mature hardwood system” in central Florida.
Bass testified that DER would have been happy to consider other proposals, but that none were submitted by FPC, and that rerouting the line along a road is a reasonable alternative. She stated that the 1:1 mitigation proposed by FPC is inadequate, that there should be at least a 10:1 ratio because of the quality of the swamp and its vulnerability to development, and that it would take sixty years to replace the mature system that was lost. She stated that other projects impact forested wetlands in Reedy Creek Swamp (Continental Development berms and roads, Owens commercial development and access road, Osceola County bridge, Wilderness Joint Venture enforcement case, Walt Disney access road, Walt Disney parking, Reedy Creek Improvement District (RCID) reuse pipeline and access road, RCID bridge, *556 Parker Poinciana DRI, Johnson Island DRI, Pleasant Hill Point DRI, Oak Hill Estates DRI, Celebration Project DRI). She testified that she would prefer to see future crossings of the swamp adjacent to existing corridors, where disturbance has already occurred.
DER’s Janet Llewellyn, chief of the Bureau of Wetland Resource Management, testified by telephone as an expert in wetlands permitting. She stated that it is not unusual for DER to consider secondary impacts in a dredge and fill permit application, and that similar projects with secondary impacts include the South Georgia Natural Gas pipeline, the Maglev train project, and three power line projects. She stated that she was involved in drafting the 1988 memo, which is only a guidance, since mitigation has to be considered on a ease-by-case basis. She stated that preservation is not always considered appropriate for mitigation, but that Twacht-mann thought it was a valuable tool which could be used only under certain circumstances and would require a much higher ratio than for creation or enhancement of wetlands. She testified that DER did a study of 119 creation mitigation sites which showed a 12% success rate.
On cross-examination, Llewellyn admitted that she had never been on the ICP site, but stated that she had flown over it in a helicopter inspection. She testified that she concurs that the project results in an impact contrary to the public interest, primarily because it “involves a loss of six acres of high quality, mature, concurrently undisturbed forested swamp wetland that is associated with the power line, and the permanent conversion of that area to an herbaceous wetland.” She testified that interior forest bird species will be the most impacted, but she was not aware of other animals. She stated that she did not think the project would adversely affect flood storage, water quality, public safety or welfare, the property of others, the flow of water, or fishing, or that it would cause harmful shoaling or erosion. She testified that she believes there is an adverse impact on primary productivity (food chain contribution) because a forested canopy produces leaf fitter, which is very important to the food chain in these systems, while the biomass produced by an herbaceous system would not be the same. She stated that a 1990 permit in Lee County had required enhancement mitigation for clearing associated with a transmission line.
Steven Godley was recalled and testified by telephone that his sampling was specifically designed to test the allegations in DER’s notice of intent to deny the permit, but that he did not bias the study. He stated he saw no evidence of tree mortality as a result of the clearing, and rejected the article on which Dr. Putz based his estimate of 15% loss of forested wetlands.
RECOMMENDED ORDER
The hearing officer recommended that the application for the permit be granted without mitigation. She found, inter alia:
1) that Reedy Creek Swamp is the only large mixed wetland forest system in Osceola County and one of the largest systems in central Florida, and provides valuable forested wetland habitat for numerous plant and animal species;
2) that clearing the transmission fine corridor “resulted in a change to that specific six acre area from a forested wetland to a herbaceous/shrub wetland” and that the proposed maintenance “will maintain that change over the expected 30-year operational fife of the transmission fine,” but that “different is not synonymous with adverse”;
3) that the South Reedy Creek basin contains 31,448 acres of contiguous forested wetland and “[bjased on the limited nature of the project’s corridor, the six acre disturbance has been correctly characterized as de min-imis”;
4) that “[t]he structural change to the wetland has not had, and will not have, any deleterious consequences to water quality within Reedy Creek”;
5) that “[t]he change from forested to herbaceous wetland was demonstrated to have had no adverse effect on the conservation of fish and wildlife in the South Reedy Creek basin”;
*557 6) that “[t]he wetland change occasioned by FPC’s project will not adversely affect endangered or threatened wildlife species”;
7) that transmission line rights-of-way cause “edge effect” which results in an increase in species number and diversity for wildlife in the corridors, as compared to the adjacent forest, and that while FPC touts the effect as essentially positive and DER describes the impact as negative, “[n]o finding is made generally on this issue, but rather in this case it is concluded that edge effect is not so significant as to constitute a negative consequence of the project”;
8) that “wildlife species residing in the South Reedy Creek basin have been and will continue to be either positively affected or not affected at all by FPC’s proposed project” and “the overall productivity of the wetland from the standpoint of vegetation and wildlife, when balanced across all plant and animal species, has not and will not be negatively affected”;
9) that “[t]he demonstrated need for this facility and the public benefit which DER has admitted it will provide, when balanced with minimal changes to the forested wetlands system, lead to the finding that this project is not contrary to the public interest”;
10) that of the existing and proposed transmission lines within a ten-year planning horizon, only three will directly cross any portion of the South Reedy Creek basin, and they will be located along existing rights of way and will have little, if any, impact on the forested component of the basin; and
11) that the only other projects suggested by DER for cumulative impact analysis were projects involving construction of berms, roads and pipelines, and developments of regional impact, which “were not shown to be similar in construction or amount of impact to FPC’s proposed electrical transmission line, except for their linear nature.”
Based on these and other findings of fact, the hearing officer concluded that FPC had met its burden of proof under section 403.-918, that “[t]he minimal changes in the subject six acres will not, as proven by the applicant, produce adverse affects,” and that since FPC had met the criteria, “mitigation is unnecessary.”
DER filed exceptions to the hearing officer’s conclusion that the change in wetland would not result in any adverse impact to the public interest factors of section 403.918(2), to her failure to consider the cumulative impact of the projects it had suggested, to her findings of fact regarding nest parasitism by the brownheaded cowbird, to her rejection of its evidence that there is a decline in forested wetlands in Florida, and to her findings that the maintenance program will eliminate nuisance plant species, that loss of some individual plants of a threatened species is inconsequential, and that the edge effect is not significant enough to constitute a negative consequence of the project.
ORDER OF REMAND
DER’s Secretary Carol Browner issued an order of remand rejecting DER’s exceptions to the hearing officer’s findings of fact except for the last one regarding edge effect, which the Secretary characterized as mixing findings of fact with conclusions of law and policy, and erroneously implying that there is a de minimis exception to cumulative impact analysis. She ruled that the hearing officer had construed the “similarity” requirement too narrowly and that the magnitude of a project’s environmental impact goes to the weight given it in the cumulative impact analysis, not to whether the project is considered. She found that corridors for roads, pipelines, and power lines are sufficiently similar in their environmental impacts, “not the least of which is the loss of forested wetlands.” She ruled that the impact of the DRIs should have been considered either in the cumulative impact analysis or in the secondary impact analysis, and that the burden of proof in both analyses is on the applicant rather than on DER (i.e., FPC had the burden of showing that the suggested projects are not within the basin). She remanded for a revised cumulative impact analysis in which the proposed ICP project would be analyzed in light of the projects referenced in the recommended order, and for additional findings of fact concerning the cumulative and secondary impacts, whether the project is contrary to *558 the public interest, and the adequacy of the proposed mitigation.
SUPPLEMENTAL RECOMMENDED ORDER ON REMAND
The hearing officer considered the eight existing and two pending dredge and fill projects presented by Medellin and Bass, and issued a supplemental recommended order in which she found, inter alia:
1) that no specific competent evidence was presented as to the actual impacts of the other projects, only “that destruction of wetlands adversely impacts fish and wildlife and their habitat generally,” but that “[wjhatever the extent that wetlands were destroyed in the above-described projects, wetlands were not destroyed in the FPC project under review[5]’;
2) that “collectively, all of the projects inventoried by DER do not diminish or refute the reasonable assurance provided by FPC that its project has not and will not violate state water quality standards or that it is not contrary to the public interest” and “expressed (sic) consideration of these additional projects does not change previous undisturbed findings of fact”;
3) that “the change has not and will not adversely effect (sic) threatened plant species, fish or wildlife,” that “[tjhose individual plants and individual habitats which were affected when the clearing took place will regenerate and will be reestablished,” and that “[wjhatever the impact on individual members of species or their habitats caused by the other projects ..., there is no negative impact from accumulation of the FPC project”;
4) that the edge effect of the project “is at least neutral, and is generally positive” and whether the edge effects of other projects are negative “is irrelevant, since the FPC project does not exacerbate those impacts”; and
5) that since the project is not contrary to the public interest, no mitigation is required, but if mitigation were appropriate, FPC’s maintenance program “is consistent with the type of mitigation required in the past for clearing associated with an electrical transmission line”.
Her conclusions of law included the following:
1) that “the FPC project does not negatively impact water quality or fish and wildlife and their habitats”;
2) that FPC proved “that the wetlands existing prior to the clearing still exist, and will continue to exist” and that “[tjhe change and conversion of wetland type did not diminish the wetlands function,” and DER “presented no credible evidence that the addition of FPC’s project to the prior, existing, and future impacts on the South Reedy Creek Basin has caused or will contribute to a cumulative or functional loss of forested wetlands in this area”;
3) that “the edge effect created by FPC’s project adds wildlife diversity and abundance to the Reedy Creek Swamp system and does not contribute to any negative effect of the other projects, which negative effect is wholly speculative”; and
4) that mitigation is unnecessary, but if DER concludes otherwise, “the project’s adverse effects are adequately offset by the proposed preservation of six acres of similar forested wetland habitat and the proposed maintenance program, both of which have been considered acceptable forms of mitigation by DER in other cases”.
FINAL ORDER
On August 13, 1992, Secretary Browner issued a final order denying FPC’s permit application. She accepted the findings of fact in both recommended orders with the following exceptions: that “wetlands” were not destroyed; that the loss of six acres of forested wetlands is not permanent and that the “habitats which were affected when the clearing took place will regenerate and will be reestablished”; that the change from forested wetlands to herbaceous wetlands has not and will not adversely affect threatened plant species, fish or wildlife and that the edge effect “is at least neutral, and is generally positive”; and that there is no adverse impact when the project is considered cumulatively.
*559 As to the hearing officer’s finding that “wetlands” were not destroyed, the Secretary ruled that the finding was infused by a policy determination “that herbaceous wetlands are somehow environmentally equivalent to forested wetlands” and rejected this policy determination. She explained: “Forested wetlands are not environmentally equivalent to herbaceous wetlands. Each have their (sic) own unique environmental functions which are not interchangeable” and “the six acres of forested wetlands habitat is lost, i.e., destroyed, regardless of whether it is replaced by a different type of wetland system or by an asphalt parking lot.”
As to the finding that the loss of six acres of forested wetlands is not permanent and that the habitats which were affected when the clearing took place will regenerate and will be re-established, the Secretary found that “the unrebutted and undisputed competent substantial evidence shows that the forested wetland will not be allowed to regenerate itself for at least 30 years.”[4]
As to the finding that the change from forested wetlands to herbaceous wetlands has not and will not adversely affect threatened plant species, fish or wildlife and that the edge effect “is at least neutral, and is generally positive,” the Secretary rejected the contention that in general one type of wetland may be replaced with another with no adverse impact, finding:
Although the degree and kinds of impacts from the conversion of forested wetlands to herbaceous wetlands may be findings of fact, whether such impacts are adverse environmental impacts and the weight accorded to them in the balancing of the public interest criteria are questions of law and policy over which I have final authority and responsibility.
Alternatively, she ruled that even if these are questions of fact, they are infused with policy considerations within the special expertise of DER.
The Secretary found that she could not accept, even under the facts of this case, that the loss of six acres of forested wetlands in an area of 31,448 acres of contiguous forested wetlands is rife minimis. She determined that the hearing officer’s finding was essentially a conclusion of law that there is a de minimis exception, which she rejected because “it would completely undercut the purpose of the cumulative impact analysis required by Section 403.919.” She observed that since the larger the tract of undisturbed habitat, the greater its environmental value, “a piecemeal destruction of a large valuable forested wetlands habitat, as is the case here, is just as important, if not more important, than the piecemeal destruction of smaller tracts of wetlands.”
The Secretary noted that an increase in species diversity for wildlife in the corridor as compared to the diversity which existed in the undisturbed forested wetland “may be an adverse impact when the natural undisturbed ecosystem has a lower species diversity” and that competent substantial evidence indicated an adverse effect in the loss of valuable forested wetlands habitat. She concluded that while the clearing of the corridor may have provided some benefit to wading birds, “the increase of species diversity over the naturally occurring species diversity in the undisturbed forested wetlands under the facts of this case is an adverse impact.” She ruled that “on balance, the loss of six acres of forested wetlands is an adverse environmental impact decreasing the relative value of functions being performed by areas affected by the project and adversely affecting the conservation of wildlife and their habitats.”
She rejected the hearing officer’s finding that there is no adverse impact when this project is considered cumulatively, because it was based upon the hearing officer’s rejected finding of no adverse impact from this project alone.
The Secretary reconsidered the balancing of the public interest criteria in section 403.-918(2) in light of the rejected finding of no adverse impact. She determined that while there are no adverse impacts under criteria *560 1, 3, 4, and 6, the project has resulted in adverse impacts under criteria 2, 5, and 7. Balancing these adverse effects against the benefit provided, she found that the project is contrary to the public interest. She rejected several of the hearing officer’s conclusions of law, and concluded that the mitigation proposed by FPC was not sufficient to offset the adverse impacts of the project. She denied the permit, noting:
[T]his project would have been permitted if FPC had offered sufficient mitigation in its application or during the hearing. Of course, this denial does not preclude FPC from reapplying with legally sufficient mitigation or a modified project.
ANALYSIS
The parties do not dispute that providing energy service promotes the public interest, that the ICP line must cross the Reedy Creek Swamp, and that some dredge and fill is therefore necessary, requiring a permit from DER. The statute makes it clear that before DER may grant this permit, FPC must provide it with reasonable assurance that the ICP project is not contrary to the public interest, and that in determining whether the ICP project is contrary to the public interest, DER must consider and balance the criteria set out in section 403.918, of which only (2), (5), and (7) are at issue in this case.[5]
FPC admits that it cut down all vegetation to the ground in the ICP right-of-way, removing the forest canopy in a sixty-foot swath through the swamp, and that its proposed maintenance activities will result in a change in the corridor from forested wetlands to herbaceous/shrubby wetlands. FPC’s expert witnesses testified that if the corridor were left undisturbed, the forested wetland would regenerate in 30-50 years (i.e., it is technically not “permanently” changed into open marsh). However, they also testified, and the hearing officer found, that FPC plans to maintain the herbaceous/shrubby wetland “over the expected 30-year operational life of the transmission line,” by periodically cutting to the ground all vegetation in fifty-feet-wide (at the poles) and thirty-four-feet-wide (between the poles) sections at the center of the corridor, and killing off all trees which will grow higher than thirty feet (i.e., most of the indigenous species) within the sixty-foot corridor.
For purposes of considering and balancing the statutory criteria, there is little doubt that the ICP project will be more permanent than temporary (criterion 5). This leaves the other two criteria at issue: “whether the project will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats” and “the current condition and relative value of functions being performed by areas affected by the proposed activity.”
As DER’s attorney observed at the hearing, this is to some extent an after-the-fact permitting process. DER was therefore required to compare the condition of the remote, undisturbed forested wetlands as they existed prior to FPC’s clearing of the corridor (and the value of the functions being performed by those forested wetlands) to the condition of the herbaceous/shrubby wetlands that have resulted from the clearing (and the value of the functions being performed by those open wetlands), and to consider also the “edge effect” of the open corridor on the adjacent forested wetlands. Almost no data was presentéd on the specific forested wetlands before the clearing, except for the ten-year water quality data considered by Dr. Smart. We can know about these forested wetlands only from general qualitative assessments from the experts on both sides that Reedy Creek Swamp is a high quality wetland area (i.e., the undisturbed forested wetlands where the corridor was cut were of high quality).
The parties do not dispute that there are significant differences between the condition of the site before FPC’s clearing activities and the present condition of the site, the *561 most notable being that all the large trees are gone, and that this difference will be maintained by FPC for at least the next thirty years if the permit is granted. The parties also do not generally dispute that, in addition to other wetland functions which remain relatively unchanged, the forested wetland which existed within the area at issue provided a habitat for various species of plants and animals which cannot live in the herbaceous/shrubby wetland resulting from FPC’s clearing and maintenance activities, and that the clearing of the corridor affected many of the other plants and animals in the corridor and in the adjacent forest in various ways, some considered positive and some considered negative.
The issues to be resolved are first, the extent of the “adverse” effects on the plants and animals in the corridor and in the adjacent forest, and second, whether these adverse effects outweigh the public benefit which will result from the project, the provision of reliable electric power to the area south of the swamp. The first issue requires factual findings, while the second issue requires a balancing of the adverse effects which are found to exist against the public benefit, to-determine whether the project is “contrary to the public interest.” § 403.-918(2), Fla.Stat. (1989). In making the latter determination, however, DER must consider not only the impact of the ICP project, but also “the impact of projects which are existing or under construction or for which permits or jurisdictional determinations have been sought” and “the impact of projects which are under review, approved, or vested pursuant to s. 380.06, or other projects which may reasonably be expected to be located within the jurisdictional extent of waters, based upon land use restrictions and regulations.” § 403.919, Fla.Stat. (1989).
The hearing officer essentially dismissed the “cumulative impact analysis” in her recommended order, and Secretary Browner ruled that she had construed the “similarity” requirement too narrowly. When the Secretary remanded for a revised cumulative impact analysis, the hearing officer considered the existing and pending dredge and fill projects, but concluded that because wetlands were not destroyed in the ICP project and FPC provided reasonable assurance that its project will not violate state water quality standards or is not contrary to the public interest, “consideration of these additional projects does not change previous undisturbed findings of fact” (i.e., that the ICP project does not exacerbate the impacts from the other projects).
Secretary Browner correctly rejected the finding that wetlands were not destroyed, on the ground that it was based on a policy determination which she also rejected, “that herbaceous wetlands are somehow environmentally equivalent to forested wetlands.” She also properly rejected the finding that there is no adverse impact when this project is considered cumulatively, which was based upon the hearing officer’s rejected finding that there was no adverse impact from this project alone. We find that Secretary Browner’s rulings were within her discretion in implementing the wetlands protection statutes.
The hearing officer did not find that there were no adverse effects from FPC’s clearing of the six acres of forested wetlands. Rather, she found that “[bjased on the limited nature of the project’s corridor, the six acre disturbance has been correctly characterized as de minimis.” The Secretary ruled that she could not accept, even under the facts of this case, that the loss of six acres of forested wetlands in an area of 31,448 acres of contiguous forested wetlands is de minimis, and that the hearing officer’s finding is essentially a conclusion of law that there is a de minimis exception, which “would completely undercut the purpose of the cumulative impact analysis required by Section 403.919.” The Secretary properly rejected the hearing officer’s conclusion that mitigation was unnecessary because there were no adverse affects from the project. These rulings, and her finding that the mitigation proposed by FPC was not sufficient to offset the adverse impacts of the project, were also within her discretion.
If FPC undertook this extensive and expensive litigation for the purpose of establishing a principle of no mitigation for power line clearing activities through forested wet *562 lands, it has failed in its endeavor. It must now decide whether it will reroute the proposed ICP power line through Reedy Creek Swamp or whether it will offer to preserve an appropriate amount of forested wetlands in mitigation of the adverse effects resulting from its clearing of the proposed ICP corridor.
The final order is AFFIRMED. FPC’s motion for appellate attorney fees is DENIED.
ERVIN, J., concurs.
ZEHMER, C.J., dissents, with written opinion.

. The areas consist of a corridor along State Road 17/92, in which existing transmission poles will be replaced with larger poles, and two other wetlands south of State Road 17/92 in which new poles will be installed. The application was modified in November 1991 to exclude the area along State Road 17/92, and a separate permit was sought for the northern four miles of corridor.

. The modified application reduced this to 301.-106 cubic yards.

. FPC denied any dredge and fill on its part, and at the hearing in December 1991 presented evidence that adjacent logging activities by the landowner had utilized the cleared corridor as a “skid trail” for removing timber.

. The hearing officer found that vegetation will be maintained at ground or water level for seventeen feet on either side of the poles while the outer thirteen feet will be allowed to regenerate except for fast growing trees, and that this change will be maintained for at least the expected thirty-year operational life of the line.

. We note that the Florida Legislature has very recently enacted chapter 93-24, Laws of Florida, which creates a limited general permit for electric utilities. However, the parties agree that the ICP project, the main impact site of which exceeds six acres, does not qualify for the new general permit, which is limited to projects with no more than one impact site exceeding a half acre, that site not to exceed two acres.